## MOTT et v FULTON et

Ohio Appeals, 9th Dist, Summit Co

No 2522.   Decided Dec 20, 1935

Edmund Burroughs, Akron, and N. O. Mather, Akron, for plaintiffs in error.

Slabaugh, Seiberling, Huber & Guinther, Akron, and Rockwell, Grant, Doolittle, Thomas & Buckingham, Akron, for defendants in error Samuel H. Squire, Supt., etc., substituted for Ira J. Fulton, Supt., etc.

**OPINION**

By WASHBURN, J.

Many claims are made by counsel for the contending parties, but as we shall notice in detail only a few of them, we have not attempted to make the foregoing statement complete as to all claims made.

It will perhaps be helpful to set forth some dates.

April 10, 1931. Act passed amending Probate Code.

April 25, 1931. Said act approved by the Governor.

May 5, 1931. Act filed in office of the secretary of state. (By its express terms, said act was to become effective on January 1, 1932).

May 30, 1931. Andrew H. Noah died.

June 4, 1931. Executors appointed.

July 16, 1931. Bank contends that its claim was allowed by said two executors.

January 1, 1932. New Probate Code became effective.

July 22, 1932. Bank's claim filed for allowance by Probate Court.

One of the important questions in this action is the effect of the re-enactment of §10727, GC (now §10509-105, GC), and the amendment of §10728, GC (now §10509-106, GC), by which amendment an executor or administrator, "within three months after the date of his appointment," is required to present, to the Probate Court for allow-ance, any claim against the estate which he may have.

Previous to such changes in the Probate Code, an executor was required to present his claim to the Probate Court, but no time within which that was to be done was speci-fied. and in the act by which a time was specified, it was expressly provided that the act should go into effect on January 1, 1932.

In this case the decedent died on May 30, and the executors were appointed on June 4—both 1931, and said bank-executor presented said claim to the Probate Court on July 22, 1932. If applicable, said statute required said bank-executor to present its claim within three months after June 4, 1931. But at the end of that period said act had not become a law, for, according to its express provisions, it was not to go into effect until January 1, 1932.

We do not agree with the contention that there was any such statute at any time prior to its effective date, to-wit, January 1, 1932. Until the act became effective as a statute in accordnce with the express provisions of the act, it might have been repealed, and thus never have become a law, or it might have been changed by amendment before it became effective.

It seems to be reasonably well settled in this jurisdiction that where a statute con-tains a provision expressly specifying a time when it shall become operative, it is of no force or effect until the date so specified, and the old law that is to be thereby amended or repealed remains in full force and operation until that time, unless a dif-ferent intention is manifest.

**Evans v Lumber Co., 11 O.C.D. 543, 21 C.C. 80.**

In the opinion in said case, as authority for the proposition that "until the day when the act is to take effect arrives the law has no force, even as notice to the persons to be affected by it," the court cites the following authorities: Endlich on Inter-pretation of Statutes, §499; Sutherland on Statutory Construction, §107; and 23 Am. & Eng. Ency. of Law, 217 and 218.

In a case involving an amended section of the statute passed on February 6, 1914, and approved February 17, 1914, and filed in the office of the secretary of state on February 19, 1914, which, by its terms, was to be effective after December 31, 1914, the Supreme Court stated in its opinion that "In view of this express provision neither the date of enactment nor the date of ap-proval by the governor is material. It is certainly clear that the amended section is of no force or effect until the date there-in specified."

Kelly v State ex, 94 Oh St 331, at p. 337.

See also—

State ex City Loan & Savings Co. v Moore, 124 Oh St 256.

Language in the opinion on page 376 in the case of Telephone Co. v Cleveland, 98 Oh St 358.

"2. Where a future time is named in an act when it shall become effective, it will speak and operate only from that time unless a different intention is manifested."

Patterson Foundry & M. Co. v Ohio River Power Co., 99 Oh St 429.

No such intention is apparent in the case at bar.

As to the application of this principle to cases involving statutes of limitations in other states, there is a conflict of authority, but we think that the logical and sound conclusion with reference to that matter is stated by Judge Cooley in the case of Price v Hopkin, 13 Mich. 318, and the case of Gilbert, Rec. v Ackerman, 45 L.R.A. 118, wherein the Court of Appeals of New York followed Judge Cooley's opinion.

We think this entire matter is well summed up in 1 Lewis' Sutherland on Statutory Construction (2nd ed.), §175, which reads in part as follows:

"Where a particular time for the commencement of a statute is appointed, it only begins to have effect and to speak from that time, unless a different intention is manifest, and will speak and operate from the beginning of that day. Where the provisions of a revising statute are to take effect at a future period, and the statute contains a clause repealing the former statute upon the same subject, the repealing clause will not take effect until the other provisions come into operation. The period between the passage of a law and the time of its going into effect is allowed to enable the public to become acquainted with its provisions; but until it becomes a law they are not compelled to govern their actions by it. Thus, an act which was to go into effect at a future day established new periods of time for the limitation of actions. It was held not applicable to a case having several years to run where the act would be a bar the moment it took effect. It could not operate to put the party on diligence before it went into operation. As it gave him no future time after it became a law, it was inoperative as to that case."

It seems to us that the Probate Act in

question was not binding upon anyone as to any of its provisions until January 1. 1932, and if it did not become binding upon said bank-executor (which will be hereinafter referred to as bank) until that date, it would not affect the rights of said bank. even though said bank knew that the act had been passed or was charged in law with that knowledge. Such bank was not bound at its peril to comply with an act until after it had gone into effect; and at the time the statute herein referred to went into effect, the period of time within which such bank was required to act had long since elapsed.

If the law be considered as a statute of limitations, which, if not complied with, barred the right of such bank, then its effect was to take away altogether the right of the bank, and under such circumstances it would not be merely a law relating to the remedy, but, as applied to said bank, a retroactive law, in violation of the constitution.

The right to bring or defend an action at law is a substantive right, within the meaning of the constitution, as to a law which attempts to take away such right altogether. Under the law as it was at the time said amendment was made, and at the time it went into effect, the bank had a vested right, without express limitation as to time for presentment, to present its claim to the Probate Court and have said court pass upon its allowance, and if the legislature had merely fixed a period after the law became effective within which such right should be exercised, and had left to the bank a reasonable time after the law became effective within which to enforce the right, it would have been a remedial statute, and as such would not have been prohibited by the constitution or by §26, GC.

But under the facts here shown, the act in question was not, as to said bank, such a law. As to such bank it either operated to take the right away altogether, and therefore violated the constitution as to retroactive laws, or it placed no limitation of time as to the exercise of such right by the bank, and in either event it is not binding upon the bank in this proceeding, and is of no force or effect in this action.

Where manifest injustice would be done by construing a statute as retroactive, courts will construe even remedial statutes as prospective only in their operation, unless the intent to make them retroactive is clearly expressed.

Messenger v Bliss, 35 Oh St 587, at p. 593.

We are further of the opinion that the enactment of said §§10509-105 and 10509-

106, GC, did not confer upon said bank a right that it did not have, previous to the amendment of said statutes, to present its claim to the Probate Court, and that therefore no "new right" was given upon condition that it be exercised within the time specified.

In connection with the subject under consideration, it was not even a "new right" on March 23, 1840, when the statute referring to it was first passed. By the common law, an executor had the right to "retain" assets of the estate in satisfaction of any debt or claim of his own against the estate, and the legislature, by said act of 1840, took said right from the executor, and prevented his being paid even as an ordinary creditor, "until" his claim has been "proved to, and allowed by, the court." In other words, said act of 1840, instead of creating a new right, limited and restricted the exercise of his existing right.

By the common law, an executor who had a claim against the estate also had the right to pay his own claim in preference to other creditors, and said statute also took that right away from him. The effect of said amendment was to place the executor in the same position as other creditors, except that, instead of allowing his own claim, he was required to present it to the court for allowance; and said denial to an executor of said previous right certainly was not the conferring upon him of a "new right."

The law did not provide when an executor should present his claim; it simply prevented payment "until" it was allowed by the court.

The law remained the same for 92 years, until the new Probate Code was enacted, and in said code said section was re-enacted in substantially the same form (§10509-105, GC), the word "until" being retained. but in another section (§10509-106, GC), it was provided that an executor having a claim against the estate "shall" present his claim "within three months after the date of his appointment."

The section of the Probate Code providing that an executor having a claim against the estate shall file his claim with the Probate Court for allowance within three months after the date of his appointment, does not bestow any right whatsoever, new or old, upon the executor. The right of an executor having such a claim to present it to the Probate Court for allowance had then been in existence in statutory form for almost a century, and was not changed in any way in the New Probate Code, the only legislation affecting it being the afore-

mentioned regulation as to the time of its exercise; and that certainly was not the creation of a "new right".

We have already given our reasons for holding that said last-named section, not having gone into effect until January 1, 1932, is not controlling in this case; but if said section is applicable, we are further of the opinion that said section is not a statute of limitation, which, if not complied with within three months, bars the claim of said executor; on the contrary, we are of the opinion that the three-months provision of said statute should be construed the same (except as to time) as the four-months provision in §10509-112, GC, relating to the presentation of claims to executors and administrators, and our reasons for that construction of the latter section are set forth in the case of Gerhold, as Admrx. v Papathanasion, No. 2561, Summit County, decided by this court on June 3, 1935.

When we consider the Probate Code as it was before §10509-106, GC, was enacted and before the amendments made at that time, it is perfectly apparent that in making said amendments the legislature intended to shorten the period for the distribution of the assets of estates; and to accomplish that result the legislature intended to bar the right of creditors to participate in such distribution in certain instances and to subject them to the penalty of deferment in distribution in other instances.

In the first-mentioned instances, language appropriate for the absolute barring of rights is used, and in the other instances the language used, when considered with the other provisions of the Probate Code, plainly indicate an intention not to bar rights, but merely to deny a preferred status to those who fail to comply with the provisions of the code within a specified time.

We find nothing in the Probate Code justifying the conclusion that the legislature intended to subject an executor-creditor to any greater penalty for failure to present his claim to the Probate Court for allowance within the three months specified in §10509-106, GC, than any other creditor is subject to for failure to present his claim to the executor within the four-months' time specified in §10509-112, GC.

It is strenuously urged that the rights of the bank were fixed as of the date of the death of Andrew H. Noah, that the guaranty, so far as operations under it are concerned, ended with said death, and that the bank's renewal of some of the construc-

tion company obligations and the consolidation, after said death, of all of its obligations into two notes, defeats the bank's right to enforce the contract.

There might be force in this contention if the guarantor in said guaranty in question was merely to become liable for future transactions between the bank and the construction company without any limitation as to the time of such transactions, and in the absence of a provision in the guaranty expressly extending the guaranty to renewals made after the death of the guarantor.

In this case there is such express provision, and it is unambiguous, and the reasons for such a provision are apparent from the evidence in the case, and by such express provision the transactions after the death of the guarantor are limited to "such right of further renewal and extension" · provided such renewals or extensions are made so as to mature "not more than one year after" such death, and there is the further provision that such extensions shall not in any manner "discharge, affect or impair" the liability of guarantor's "estate" for such renewals.

Significant also is the further provision in said guaranty that the death of the guarantor shall not "terminate the authority granted said bank * * * to extend and renew" said "notes, loans, and obligations after" the death of the guarantor, "as herein provided."

We know of no reason why a person may not lawfully bind his estate to perform a contract such as is here involved, including the further provision that the contract "shall be liberally construed in favor of" the bank.

The effect upon the guaranty of the death of the guarantor depends upon the provisions of the contract of guaranty.

As we view this contract, the bank having advanced a large amount to the construction company in reliance upon a former guaranty of Andrew H. Noah and the endorsement by said Noah of obligations of said construction company (said indebtedness of the construction company being evidenced by its notes to the bank), and said Andrew H. Noah and his son, Robert H. Noah, in order to secure a renewal of such obligations from time to time over a period ending one year after the death of either of them, having executed the guaranty in question, it became, upon acceptance by the bank in substitution for existing obligations of Andrew H. Noah for said indebtedness, a contract supported by a present single, entire and valuable consideration, and created an entire and indivisible obligation upon said Andrew H. Noah and his estate to pay said existing indebtedness of said construction company to said bank, and to pay said indebtedness as a whole, and not as separate obligations; in other words, the subject of the contract was an entirety, although separate parts of the whole might be renewed at different times.

We arrive at this view by applying the rule of construction governing guaranties, which is "to give effect to the intention of the parties, as expressed in the instrument, read in the light of the surrounding circumstances."

While the wording of the guaranty is to "absolutely and unconditionally **guarantee** the prompt and full payment of said indebtedness," the instrument was in fact an agreement to pay an indebtedness which, as between the bank and Andrew H. Noah, was virtually incurred by said Noah, and accordingly he was a guarantor in name only.

The language of the contract "that this guarantee shall be an absolute guaranty until such time as we shall terminate the same in writing," when considered in connection with the whole instrument and the facts and circumstances shown by the record, means no more than that, while renewals for a definite period had been contracted for, Andrew H. Noah could shorten that period by written notice; but such action on his part would not release him or his estate from obligation to pay. Renewals would not increase his obligation, but would affect only the time when he should perform his obligation.

The contract provided that if he did not so shorten the period, the renewals should continue for one year after his death, and that his estate should be bound the same as if he had not died.

The general rule of construction is that when the engagement of a surety is a contract partly for his benefit, and not a bare authority, it is not revoked by his death. Under the contract and circumstances in this case, the right to shorten said period is not a right to revoke the contract, in the sense in which that term is used in cases which hold that a guaranty is revoked by the death of the guarantor. Here the contract expressly and **specifically** provides that death should **not** revoke the contract but that the contract should be carried out regardless of that event, and that the guarantor's estate should be liable for the performance of the contract.

No advances were made to the construc-

tion company, and no really new obligations were incurred, after the death of Noah; even the interest accruals on the existing obligations were not added to the obligations. The interest and also a substantial amount of principal were paid by said construction company after Noah's death.

Under the circumstances here presented, we hold that the death of Andrew H. Noah did not revoke said contract nor in any wise penalize the bank for performing the contract after Noah's death, and that the renewals of some of said obligations, and the consolidation of the evidence of said obligations into two notes by the bank after said death, were within the terms of the contract, liberally construed, and did not release Noah's estate from said Noah's obligations under the contract.

We may not have noted in this opinion all of the contentions of plaintiff·· in error, but all that were made in argument or brief have been considered.

Judgment affirmed.

FUNK, PJ, and STEVENS, J, concur in judgment.

NOTE:—This case certified to the Supreme Court, on the ground that the judgment therein is in conflict with the judgments pronounced in the cases of **Matthews v Raff, Admr. et, 45 Oh Ap 242, (15 Abs 94), and Beach, Rec. v Mizner, Exr., 4 OO 253. (20 Abs 380).** (Affirmed. See History).